For the foregoing reasons, the judgment of the Claims Court is affirmed.

AFFIRMED.

J.E.T.S., INC., Appellant,

v.

The UNITED STATES, Appellee.

No. 87–1269.

United States Court of Appeals, Federal Circuit.

Feb. 11, 1988.

Hugo N. Gerstl, of Gerstl & Gorman, Monterey, Cal., argued for appellant.

J. Keith Burt, Commercial Litigation Branch, Dept. of Justice, argued for appel- lee. With him on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and Mary Mitchelson, Asst. Director.

Before MARKEY, Chief Judge, FRIEDMAN, Circuit Judge, and BALDWIN, Senior Circuit Judge.

FRIEDMAN, Circuit Judge.

This is an appeal by a government contractor from a decision of the Armed Services Board of Contract Appeals (Board) denying the contractor's claim for an equitable adjustment in the contract price. The Board previously had held that the contractor was entitled to such an adjustment and remanded the case to the contracting officer to determine the amount thereof. After the contracting officer had denied any award and while the contractor's appeal from that ruling was pending before the Board, a corporation of which the contractor was a wholly-owned subsidiary and the two principals of that corporation were indicted and convicted of various offenses against the government. A major element of the criminal case was that they had falsely certified that the corporation was a small business, for which both the other contracts involved in the criminal case and the contract in the present case were set aside. On the basis of the convictions, the Board held that the contractor was not entitled to recover. We affirm.

I

A. On April 1, 1980, the United States Air Force entered into a contract with the appellant, J.E.T.S., Inc., under which J.E.T.S. would furnish all necessary personnel for full food service management at an air base. The contract was for one year. The government had the option to extend the contract for two subsequent years at the same price by giving specified notices.

At the close of the first year of performance, the government, on March 31, 1981, exercised its option to extend the contract for another year at the same price. The government's written exercise of the option stated:

Funds are not presently available for this procurement. The Government obligation hereunder is contingent upon the availability of appropriated funds from which payment for the contract purposes can be made. No legal liability on the part of the Government for payment of any money shall arise unless and until funds are made available to the Contracting Officer for this procurement and notice of such availability, to be confirmed in writing by the Contracting Officer, is given to the contractor.

In response to J.E.T.S.' request for an immediate ruling on whether the government properly had exercised its option, the contracting officer ruled on May 5, 1981, that the exercise was proper. J.E.T.S. performed the contract for the second year under protest, stating that it expected to be paid the reasonable value of its services. The government paid it at the contract price.

On J.E.T.S.' appeal from the contracting officer's decision, the Board held that the government's exercise of the option was invalid. The Board stated:

It is well settled that in order for the Government to properly exercise an option, its acceptance of the offer must be unconditional and in exact accord with the terms offered. (Citations omitted.) Here the purported execution of the option included the availability of funds clause and made the execution conditional upon the subsequent availability of funds for performance of the contract and written notice to appellant of such availability. It is undisputed that funds were not available for performance during the option period on or before the date for acceptance of the option, 15 April 1981, nor by the date of commencement of the second year of the contract, 1 May 1981.

. . . .

. . . Appellant's continued performance constituted a constructive change under the contract for which it is entitled to an equitable adjustment. The appeal is sustained and the matter is remanded to the contracting officer to negotiate the amount of such adjustment.

*J.E.T.S., Inc.,* 82–2 B.C.A. (CCH) ¶ 15,986, at 79,274 (1982).

While the appeal before the Board was pending, the government exercised the option to renew the contract for a third year at the original price. J.E.T.S. responded that the government had not validly exercised the option for the first extension, that accordingly the contract was no longer in effect, and that the second option therefore could not be exercised. J.E.T.S. continued to perform the contract under protest through the third year, and the government continued to pay J.E.T.S. at the contract price.

Following the decision of the Board, J.E.T.S. filed with the contracting officer claims for an equitable adjustment for the second and third years of the contract. When the contracting officer failed to issue a decision within the time specified in the Contract Disputes Act of 1978, 41 U.S.C. § 605(c)(1) (1982), J.E.T.S. filed an appeal with the Board. (The contracting officer subsequently denied J.E.T.S.' claim in its entirety.)

B. Under the Small Business Act, 15 U.S.C. § 631 et seq. (1982), certain government contracts are set aside for small businesses. A small business is "one which is independently owned and operated and which is not dominant in its field of operation." *Id.* § 632. Under regulations of the Small Business Administration explaining when a business is "small," the focus for service industries is on annual receipts, and businesses with annual receipts greater than specified amounts are not "small." 13 C.F.R. §§ 121.1—121.13 (1986). In determining whether a service business is "small," the average annual receipts for the past three years of the company and its affiliates will be considered. *Id.* § 121.2(a)–(c).

The food service management contract that J.E.T.S. entered into was 100 per cent set aside for small business. Before obtaining the contract, J.E.T.S. certified to the Air Force that it was a small business.

C. While the second appeal to the Board was pending, Thomas F. Gibbs, Leo J. Barnette, Allied Management Corporation (Allied), and others were indicted for conspiracy to defraud the government, making false statements to the government, and mail fraud. J.E.T.S. is a wholly-owned subsidiary of Allied. Larry Barnette was the president and principal stockholder of Allied, and Thomas Gibbs was the vice president and minority stockholder.

A major charge of the indictment was that in obtaining four other government contracts, Allied had falsely certified that it was a small business. Two of those contracts were food service contracts at other military bases and the two others were laundry service contracts at a military base and in the Federal Republic of Germany. These contracts were entered into and performed at various times between January 1, 1977 and August 1982.

The jury convicted the defendants on various charges, and the court of appeals affirmed. *United States v. Barnette*, 800 F.2d 1558 (11th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987). In a section of its opinion captioned "The Small Business Set Aside Program," the court of appeals held:

> [T]he government demonstrated that Allied and its affiliates had become "large" for SBA size purposes for most types of contracts....
>
> Notwithstanding the size of the Allied conglomerate, Allied, through Barnette and Gibbs, continued to submit bids on contracts set aside for small business concerns. From 1978 through 1981, Allied falsely certified on each bid document that it was small, and thus eligible to bid on contracts set aside for small businesses.

*Id.* at 1565.

D. Following the court of appeals affirmance of the convictions, the government moved before the Board for summary judgment. The Board granted the motion and denied J.E.T.S.' appeal. The Board stated:

> [T]here is no genuine issue of material fact concerning the question of appel-

lant's size or whether during that period appellant was aware that it was a large corporation and knowingly certified to the contrary. The conviction resolved these questions. Therefore, appellant is estopped from now denying that it knowingly and willfully made false, fictitious and fraudulent statements by certifying appellant was a small business when it submitted its bid for this small business set aside contract in November 1979.

*J.E.T.S., Inc.*, 87–1 B.C.A. (CCH) ¶ 19,569, at 98,916 (Jan. 16, 1987).

The Board concluded:

> [T]he bad faith of appellant in securing the award made the award voidable, if not void. This was not known to the contracting officer until after completion of the contract and the option period before us. In its pleadings and motion for summary judgment the Government has, in effect, asserted its avoidance of the contract. Having done so, it would pertain not only to the contract but also to the option period before us. We also recognize that the question before us at this time is not entitlement to recover but the amount which the appellant is entitled to recover. However, to permit recovery of any further monies under the circumstances would be an affront to the integrity of the federal procurement process.

*Id.* at 98,917.

## II

J.E.T.S. contends that the earlier decision of the Board that it was entitled to an equitable adjustment because the government had made a constructive change in the contract was *res judicata* concerning its right to recovery, that the only issue open for the Board to decide in the second appeal was the amount of recovery, and that the Board's decision in the second appeal was an impermissible reversal of its prior decision.

■ Since the second appeal was but a further step in the litigation of the same case, the governing principle for determining what issues were open to the Board is

not *res judicata*, but the law of the case. *United States v. Turtle Mountain Band of Chippewa Indians*, 612 F.2d 517, 520, 227 Ct.Cl. 1 (1979). "Thus, 'once a case has been decided on appeal, the rule adopted is to be applied, right or wrong, absent exceptional circumstances, in the disposition of the lawsuit.'" *Id.* (quoting *Schwartz v. NMS Indus., Inc.*, 575 F.2d 553, 554 (5th Cir.1978)). There are three "exceptional circumstances" that justify a departure from the law of the case: "'[T]he evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.'" *Id.* 612 F.2d at 521 (quoting *White v. Murtha*, 377 F.2d 428, 432 (5th Cir.1967)). *See also Smith Int'l, Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1576 (Fed.Cir.), *cert. denied*, 474 U.S. 827, 106 S.Ct. 87, 88 L.Ed.2d 71 (1985); *Gindes v. United States*, 740 F.2d 947, 950 (Fed.Cir.), *cert. denied*, 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984).

The Board's decision in the first appeal was "clearly erroneous" and to follow it "would work a manifest injustice." The contract which, according to the Board's decision in the first case, the government constructively had changed, was procured by and therefore permeated with fraud. As discussed in part III below, J.E.T.S. obtained this contract by knowingly falsely stating that it was a small business. Had it stated the truth about its size, it would not have received the contract. A government contract thus tainted from its inception by fraud is void *ab initio*, like the government contracts held void because similarly tainted by a prohibited conflict of interest in *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), and *K & R Eng'g Co. v. United States*, 616 F.2d 469, 222 Ct.Cl. 340 (1980).

If in the first appeal the Board had been aware of J.E.T.S.' fraud in obtaining the contract, the Board would not have held that J.E.T.S. was entitled to an equitable adjustment for the government's constructive change in the contract. The Board correctly stated in the present appeal, "to permit recovery of any further monies under the circumstances would be an affront to the integrity of the federal procurement process." *See Mississippi Valley*, 364 U.S. at 564–65, 81 S.Ct. at 316–17. "The protection of the integrity of the federal procurement process from the fraudulent activities of unscrupulous government contractors," *K & R Eng'g*, 616 F.2d at 476, fully supported—indeed, required—denial of J.E.T.S.' claim for additional compensation once J.E.T.S.' fraud in obtaining the contract was disclosed. This is so even though, when the fraud was not yet known, the Board earlier had determined that J.E.T.S. was entitled to additional money.

Moreover, since the facts concerning J.E.T.S.' fraud were not known at the time of the first Board decision and became known only during the pendency of the second appeal, the case also comes within the exception covering the situation when "the evidence on a subsequent trial was substantially different." Although there was no subsequent trial, the evidence before the Board on the second appeal was substantially different from that before it on the first appeal, since it was only on the second appeal that the fraudulent procurement of the contract was disclosed.

### III

J.E.T.S. further contends that the Board improperly relied on the criminal convictions of its corporate parent and the two principals as a basis for concluding that the contract was void or voidable because tainted by J.E.T.S.' fraud in falsely representing that it was a small business. J.E.T.S. stresses that the present contract was not involved in the criminal case and that J.E.T.S. was not a defendant in that case.

Although J.E.T.S. was not a party in the criminal case, it was very much a part of the activities upon which the criminal convictions were based. The court of appeals described J.E.T.S. as "a wholly owned subsidiary of Allied that performed government service contracts throughout the

world," 800 F.2d at 1560, and as "part of the Allied conglomerate." 800 F.2d at 1563. The court referred to "Allied, doing business as J.E.T.S." 800 F.2d at 1564. The court noted that during the years involved, Gibbs, who signed the present contract and certified that J.E.T.S. was a small business, filed other false statements on behalf of J.E.T.S. with respect to J.E.T.S.' size. 800 F.2d at 1565. As a wholly owned subsidiary of Allied, J.E.T.S. appears to have functioned as Allied's operating division and alter ego.

 "It is well established that a prior criminal conviction may work an estoppel in favor of the government in a subsequent civil proceeding," but the "estoppel extends only to questions 'distinctly put in issue and directly determined' in the criminal prosecution." *Emich Motors Corp. v. General Motors*, 340 U.S. 558, 568–69, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951). The criminal conviction thus would have estopped Allied, Barnette, and Gibbs from denying before the Board that they had misrepresented to the government that the contractors for the four other contracts involved in the criminal proceedings were small businesses, since that question had been "distinctly put in issue and directly determined" in the criminal case.

Those four contracts were similar to the contract in the present case. Two were food service contracts, and two were laundry service contracts. All of them were executed and performed at the same time as the present contract. In all four of them, the certificates of small business qualification were false because, in determining the size of the contractor, the receipts of affiliates of the contractor were ignored in violation of the regulation requiring those receipts to be included. The

other false statements that Gibbs filed with respect to the size of J.E.T.S. had the same flaw of failure to include the receipts of affiliates. The record also showed that in 1980, Gibbs told "an employee not to refer to the German laundry contract in another bid because if J.E.T.S. listed the laundry contract 'in the experience section, it would have to be included in the gross income also [sic].'" 800 F.2d at 1565.

Considering all the circumstances, we cannot say that the Board erred in concluding that J.E.T.S. had committed fraud in obtaining this contract by knowingly falsely certifying that it was a small business. Neither in its response before the Board to the government's motion for summary judgment nor in its brief before this court did J.E.T.S. assert that it was a small business when it obtained the contract or contend that it could show at a hearing that it filed an accurate certification. The Board correctly concluded that there was "no genuine issue as to any material fact" (Rule 56(c), Federal Rules of Civil Procedure) that precluded summary judgment and that because the contract was fraudulently obtained, the government was entitled to summary judgment denying J.E.T.S.' appeal.

## CONCLUSION

The decision of the Board denying J.E.T.S.' appeal is

AFFIRMED.