ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Hollymatic Corporation | ) | ASBCA Nos. 61920, 61956 |
| | ) | |
| Under Contract No. HDEC04-18-D-0004 | ) | |

APPEARANCE FOR THE APPELLANT:     Bruce A. Courtade, Esq.
                                    Rhoades McKee
                                    Grand Rapids, MI

APPEARANCE FOR THE GOVERNMENT:     Brian Lucero, Esq.
                                    Deputy General Counsel
                                    Defense Commissary Agency
                                    Fort Lee, VA

OPINION BY ADMINISTRATIVE JUDGE THRASHER

These appeals involve a Defense Commissary Agency (DeCA or Government) commercial contract to purchase meat mixer/grinders[1] from Hollymatic Corporation (Hollymatic or appellant) for use in military commissaries.  The government issued a contracting officer's final decision (COFD) terminating Hollymatic's contract for cause and asserted a government claim for return of $470,668 paid to Hollymatic (R4, tab 30).  Hollymatic timely appealed the COFD decision:  the termination for cause appeal was docketed as ASBCA No. 61920 and the appeal of the government's claim for return of the monies already paid was docketed as ASBCA No. 61956.  The government's subsequent Answer asserted the affirmative defenses of fraud in the inducement.  Thereafter, the parties requested that we bifurcate the proceedings and first address only this affirmative defense before other issues are addressed.  We granted the parties request.  Consequently, we only address whether there was fraud in the inducement.  The parties have elected to proceed on the record pursuant to Board Rule 11.[2]

---

[1] These mixer/grinders, as the name implies, both grind and mixes the meat.  The term mixer/grinder is sometimes used by the parties interchangeably with "grinder/mixers", "grinder" or "mixer".  We likewise use these terms interchangeably.

[2] The record includes a joint stipulation of facts we refer to as (stip.)

FINDINGS OF FACTS

Background on the Parties

1. Hollymatic is a nearly 90 year-old manufacturer and supplier of equipment and packaging to food manufacturers throughout the United States and the world and has supplied meat grinders/mixers to the government for its store level meat processing departments for more than two decades. Prior to this incident in question there were no known complaints or prior problems relating to the safety approval status of Hollymatic's equipment. (Stips. 1-3) DeCA is an agency of the United States Department of Defense whose "mission is to operate an efficient and effective world-wide system of military store locations for the resale of groceries and household supplies at the lowest practical price ... to members of the military services, their families and other authorized patrons, while maintaining high standards for quality, products, and services." Department of Defense Directive 5105.55 (3).

The Solicitation

2. On April 3, 2017, the government published Solicitation No. HDEC04-16-R-0046 (Solicitation) to procure mixer/grinders for its store level meat processing departments (R4, tab 1). The Solicitation sought a commercial item pursuant to Federal Acquisition Regulation (FAR) Part 12. It contained FAR 52.212-1, -2, and -4. (R4, tab 1 at 25, 27, 30-31, 34) The definition of a commercial item, found in FAR 2.101, is: "any item that has been sold, leased, or licensed to the general public; or has been offered for sale, lease, or license to the general public."

3. The stated purpose of the Solicitation was to acquire a mixer/grinder to thoroughly mix and blend lean and fatty meat products for further processing into other products (R4, tab 1 at 29). The Solicitation provided that one award would be made based on a lowest price technically acceptable basis and that, "Failure by the offeror to submit all of the requirements may cause the offer to be rejected with no further consideration given." (R4, tab 1 at 25, 30) A rating of "Technically Acceptable" was required in order to be eligible for award and offerors would only be determined to be technically acceptable if their proposed product complied with the technical requirements and received at least an acceptable rating for each past performance evaluation sub-factor (*id.* at 30).

4. The solicitation directed:

> (b)(4) Product Information: Offerors shall submit descriptive literature, a matrix, specifications, drawings, cut sheets, or other information that demonstrates that their proposed products meet or exceed ALL the mandatory generalized

operating specifications of the Commissary Equipment Description (CED). Be sure your documentation clearly shows which model is included in the proposal. Be sure to document how each specification in the CED is met or exceeded, but do not simply copy the CED into your technical proposal.

(R4, tab 1 at 26) Relevant to this appeal, CED 3.2.4 required auger and mixer arms powered by separate motors, CED 3.2.6 required a minimum 1.0 hp mixing motor, and CED 3.3.1 required that the product be Underwriters Laboratory (UL) listed and National Sanitation Foundation (NSF) 8 certified, or approved equivalent (R4, tab 1 at 29). Although there were two amendments to the solicitation, neither amendment changed the CED requirement for two motors (R4, tab 3, tab 42 at 570 ¶¶ 23-25). [3]

Hollymatic's Proposals

*Initial Proposal*

5. On April 17, 2017, appellant submitted a proposal in response to the solicitation that included a document titled "Hollymatic Approval Chart", dated April 5, 2017, showing that the proposed product, the Hollymatic grinder Model 180A (Model 180A) was UL listed on 5/16, and NSF certified on 1/87 (R4, tab 2 at 149). The proposal specifications and drawings also showed that a single 10 hp motor would drive the Model 180A grinder (*id.* at 148, 157). Additionally, the proposal included a diagram and parts list that included the UL label and the NSF label (*id.* at 155-56).

6. DeCA received multiple offers in response to the solicitation (R4, tab 42 at 568 ¶ 7). Ultimately the government conducted four rounds of discussions with Hollymatic and its remaining competitor (stip. 22). The initial proposal included an "Approval Chart" indicating the year of UL certification and NSF approval (R4, tab 2 at 149). The government accepted Hollymatic's representation regarding the UL certification (stip. 20) and NSF approval status in its initial proposal (R4, tab 41 at 485, 487, 489, tab 40

---

[3] During this appeal both Mr. Paul Andres and Ms. Liskey submitted sworn affidavits stating that the solicitation was modified to require the addition of the second motor (app. resp. br. at ex. 1, aff. of P. Andres ¶ 5; ex. 2, aff. of S. Liskey ¶ 15). Ms. Gross-Bendall's declaration directly contradicts this, stating the changes did not relate to the issues in this appeal (R4, tab 42 at 570 ¶¶ 23-25). Additionally, it is clear from a reading of the initial solicitation and the modifications that none of the changes to the CED had anything to do with the dual motor requirement.

3

at 471-472).[4]  Additionally, Hollymatic received an acceptable past performance risk rating (R4, tab 40 at 471).  However, Hollymatic's proposal was rated "Technically Unacceptable" after each of the first three rounds of discussions.  Each of the Source Selection Evaluation Board (SSEB) Chairman's memorandums noted that the proposed product was a single motor grinder[5] (R4, tab 40, tab 41 at 484, 488, 512).  Discussions were reopened on November 13, 2017 with Hollymatic and its competitor (R4, tab 3). Hollymatic was informed that same day, that its product was found to be technically unacceptable due to noncompliance with CEDs 3.2.4 (requiring two separate motors) and 3.2.6 (1.0 hp mixing motor) (stip. 23).

*Final (Revised) Proposal*

7.  On November 13, 2017, the Contracting Officer (CO) and Source Selection Authority (SSA), Ms. Diana Gross-Bendall, forwarded a letter to Hollymatic's Governmental Accounts Sales Manager, Ms. Sue Liskey, informing her that due to some changes in the CEDs the government was reopening discussions.  Additionally, this letter reminded Hollymatic that its proposal was previously found to be technically unacceptable due to not complying with CEDs 3.2.4 and 3.2.6 and requested Hollymatic provide the model number and technical specifications of the proposed item and to show how the product met the CED.  (R4, tab 3)

8.  Hollymatic submitted its final (revised) proposal the following day, November 14, 2017 (R4, tab 4 at 197).  The revised proposal also contained specifications and drawings for the Model 180A which still included the UL label in the diagram and parts list (stip. 25). The revised proposal offered the Model 180A mixer/grinder, the same model number previously proposed, and included a Safety Label Placement drawing and Label List identical to the one in the initial proposal (R4, tab 2 at 155-56, tab 4 at 282-83).  However, it did not include the "Approval Chart" provided in the initial proposal indicating the UL certification and NSF approval dates.  The revised proposal also stated, "3.2.4 – Yes, Augers and Mixing arms are powered by separate motors.  We are including our Mix Assist Motor Option at no cost.  See Drawings.  3.2.6.- Yes, it is a 1.0 HP mixing motor – See Brochure, and Drawing Drive Components."  (R4, tab 4 at 269)  However, the proposal did not state any conditions or contingencies regarding the development of the dual motor Model 180A product, or UL and NSF approval status (R4, tab 42 at 571 ¶¶ 27-28).

9.  Upon reviewing the Hollymatic's proposal, contract specialist, Ms. Melba Brown, forwarded an email on November 28, 2017 to Hollymatic requesting clarification

---

[4] It is undisputed that appellant's single-motor Model 180A grinder offered in its initial proposal was UL certified and NSF approved at all times relevant to this dispute (stip. 21).

[5] Other issues raised during discussions and changes to the Solicitation are not relevant to this appeal.

on "CED Responses – Please point out in your drawings of the CED and where in your narratives these are standard features and not options for the following: 3.2.4 [dual motor requirement] 3.2.6 [1 hp motor requirement] . . ." (R4, tab 41 at 525) Hollymatic, via Ms. Sue Liskey, responded that same day stating in pertinent part:

> 3.2.4. – 3D drawing is showing the mix motor. Also, Page 17 shows the grind motor. Page 18 shows the mix motor.
>
> 3.2.6. – Page 18 of the drawings. The 1 HP motor is under option because it is not used on a 175 machine. The brochure is used for both machines 175 & 180 machine. It was an option but will be standard equipment for the Government. All specifications on the CED will be standard equipment.

*(Id.)* Additionally, the technical data for the Model 180A, submitted in the final proposal, showed a second motor under "Optional Features" for the Model 180A (R4, tab 4 at 272).

10. After evaluating Hollymatic's revised proposal, the government determined that its proposed product was technically acceptable and on June 1, 2018 awarded contract No. HDEC04-18-D-0004 ("the contract") to Hollymatic (stips. 26-27).

*Delivery Orders and Deliveries to Commissaries*

11. Mr. Robert French, the DeCA contract specialist responsible for ordering the machines, testified that, "DeCA had an immediate need for mixer/grinders at multiple store locations due to the fact the previous contract had expired May 31, 2017 and no mixer grinders has been ordered for over a year" (R4, tab 43 at 577 ¶ 9). Ultimately, the government issued 23 delivery orders for a total of 42 units during performance of the contract until the date of contract termination and paid Hollymatic $470,668.00 for the 38 units that were delivered to the stores (R4, tabs 30, 35). The original sixteen (16) orders were delivered on various dates between August 21, 2018 and October 1, 2018. "At no time did Hollymatic disclose to [Mr. French] that the product was in development, that it was being tested for operation, and/or that UL approval was still pending." (R4, tab 43 at 578 ¶¶ 16-17).

12. After delivery and installation of the new mixer/grinders, multiple commissary stores reported electrical issues to the Equipment Maintenance Division at DeCA headquarters, such as: electrical cords and/or plugs on the new grinder which had to be replaced (R4, tabs 6-9). Photos of the new grinders delivered to the commissary stores show that the products displayed NSF approval stickers. (Rule 4, tabs 6A, 9A, 14A-14B, 15A-15C) On October 24, 2018, the government issued Hollymatic a cure notice, stating "These units are noncompliant with contract requirements 3.3.1, Industry

Standards:  Underwriters Laboratory (UL) listed and National Sanitation Foundation (NSF) 8 certification, or approved equivalent and 3.2.2, minimum ground meat output of 35 pounds per minute."  Hollymatic was given 10 days to make the necessary corrections and replace the noncompliant units at no additional cost to the Government.  (R4, tab 23)  Subsequently, the government verbally agreed to extend the deadline to comply with the 10-day cure period until November 6, 2018 (R4, tab 24).

13.  On November 9, 2018, the government issued a COFD terminating the contract for cause, asserted a government claim for return of the $470,668 already paid to Hollymatic for delivery of 38 grinders and demanded Hollymatic pick-up all units at its expense (R4, tab 30).

14.  Hollymatic responded that same day by letter requesting the government reconsider because the government's notice contained several significant misstatements and unsupported conclusions (R4, tab 31).  The government did not respond to Hollymatic's request to reconsider the termination and on November 21, 2018, issued contract modification terminating the contract based on the contractor's failure to meet contract requirements specified in the contract and cure notice (R4, tab 32 at 427).

15.  On December 28, 2018, the government received notice that the appellant appealed the contract termination and the government claim for return of the monies already paid to this Board and was docketed as ASBCA Nos. 61920, 61956 respectively.  The notice of appeal stated, "After completely redesigning its machine to fit DeCa's new dual-motor requirements, Hollymatic beat out its competitors in a competitive-bid process and was awarded a five-year contract to provide the meat grinders."

16.  On January 28, 2019, the government filed its Answer asserting an affirmative defenses of fraud in the inducement and material misrepresentation relating to the UL and NSF approval status of the units (gov't answer, Part III at 29-30).  The government's Answer also included a counterclaim seeking payment of $470,668 for the rejected and noncompliant products (gov't answer, Part IV at 32-33).  Thereafter, the parties agreed to bifurcate this appeal, stipulating, "In this bifurcated appeal, the issue of whether the equipment could satisfy the minimum meat output requirement is not currently before this Court, but may be at issue in the second portion of the appeal."  (Stip. 44)

*Development of the Dual Motor Model 180A*

17.  Given the realization that their only chance of winning award of this contract was to offer a dual motor machine meeting the CED requirements, Hollymatic began developing a dual motor version of the 180A single motor product during the source selection.  Mr. Andres, Hollymatic's mechanical engineer, testified that,

6

[¶ 4] Hollymatic sold only single-motor mixer/grinders and did not make or sell any dual-motor mixer/grinders prior to June 2018.

[¶ 5] Hollymatic designed a two-motor mixer/grinder only because the Government changed the specifications in the Solicitation at issue in this case to require a dual-motor unit.

[¶ 6] If Hollymatic did not receive the contract at issue in this dispute, it had no plans to produce a dual-motor mixer/grinder, so Hollymatic did not plan to seek UL or NSF certification unless it was the winning bidder on the contract.

(App. resp. br. at ex 1, aff. of P. Andres ¶¶ 4-6) Additionally, although offered as a version (option) of the 180A model, Hollymatic described the dual motor product in its notice of appeal to this Board as "complete[ly] redesign[ing]" of its mixer/grinder. (Notice of Appeal at 2, 5 ¶ II (d)). Hollymatic's response to government interrogatories described the complete redesign as follows:

The complete re-design of the machine included figuring out a way to go from a single motor design to a dual motor design. The interior machine space had to be calculated to fit an extra motor and there needed to be a way to drive the mix process with a separate motor versus the traditional way of engaging a manual reversing clutch. New parts had to be machined and new electrical components had to be added to make this all possible.

(Gov't. supp. R4, tab 38 at 466-67, Response to Interrogatory No. 8)

*The Dual-Motor Model Offered in Hollymatic's Final Proposal was not UL Listed or NSF Certified Until After Award and Delivery of the Machines*

*UL Listing*

18. We find that the grinder/mixer offered in Hollymatic's final proposal was not UL listed or NSF certified at the time offered or at time of award. In fact, Hollymatic had no intention to seek UL listing or NSF certification until after contract award. Mr. Andres testified that, "[I]f Hollymatic did not receive the contract at issue in this dispute, it had no plans to produce a dual-motor mixer/grinder, so Hollymatic did not plan to seek UL or NSF certification unless it was the winning bidder on the contract." (App. resp. br. at ex 1, aff. of P. Andres ¶ 6) It was not until ten days after contract award, on June 11, 2018, that Hollymatic contacted UL "to open a new UL project on our 180 machine...

7

This will be a very hot item to get completed." The title of the email is "New ul project." (Gov't supp. R4, tab 36 at 436) On June 12, 2018, in an email to UL, Hollymatic identified the following changes to the Model 180A mixer grinder: "We will be adding a 1 H.P. motor to the machine. So the machine will now operate with two motors..." (gov't supp. R4, tab 36 at 439) UL responded that, "If you are adding a second motor to the unit, we will have to run tests." (Gov't supp. R4, tab 36 at 439)

19. On October 5, 2018, after receiving the store reports of electrical issues with the new mixer grinders, the government sent a direct inquiry to UL to confirm whether the new grinders delivered to the commissary stores (Model 180A, dual motor) had been tested and approved (stip. 31). On October 10, 2018, the government sent Hollymatic a Letter of Concern and requested that Hollymatic certify the following information on the new grinders: amp draw of equipment and UL listing (stip. 32). The letter additionally requested that NSF certification status be addressed in the signed response (R4, tab 18). The following day, October 11, 2018, Hollymatic submitted a letter to the government, stating "An internal issue caused an error with the UL approval process" (stip. 33). The letter also stated, "NSF approved and will resend if necessary." But did not provide any other information regarding the actual status of its UL certification (R4, tab 21).

20. On October 18, 2018, Hollymatic submitted another letter to the government admitting the machines delivered were not UL certified, stating,

> We are in the process of getting a hard date from UL. We suspect this will happen in the next few days... We propose as the machine is UL certified we will ship the new machine to the 23 locations. At that time, we will supply the information for the return of the uncertified machine or machines.

(Stip. 35) It was not until October 31, 2018, that UL issued a "Notice of Completion and Authorization to Apply the UL Mark" (R4, tab 25). We find that the grinder mixer offered in Hollymatic's final proposal was not UL certified until October 31, 2018.

*NSF Certification*

21. The government sought information regarding the status of NSF certification of the delivered machines and in response, on January 7, 2019, the government received an email from NSF stating "Only the 180A appears in our listings." The email also contained a weblink. (R4, tab 34 at 431) The weblink shown in the NSF email opens a document titled "175 & 180A mixer grinders." Specifications of the Hollymatic 175 and 180A are shown on the second page of the document (R4, tab 34A at 434). The government's supply management specialist reviewed the email and document provided by NSF. He stated: "[B]elow is the answer from NSF and when I copied and pasted the

8

link it led me to their website which lists only the previous model, with the 1 motor configuration.  It appears to me as if they did not submit the 2 motor configuration for NSF certification."  (R4, tab 34 at 431)

22.  During the course of this appeal, Hollymatic submitted three exhibits showing communications with NSF, two dated February 2019 and one on April 2019 (app. supp. R4, tabs 3-4, 44).  The Hollymatic exhibits dated February 2019 reference approval of a Hollymatic 180A mixer/grinder in December of 2009, "and has remained NSF certified without interruption in status" (app. supp. R4, tab 3 at 202).  The Hollymatic exhibit dated April 2, 2019 shows an email exchange between Hollymatic and NSF.  Hollymatic states:  "We updated our 180A last summer, but only added another motor to the cabinet." (App. supp. R4, tab 44 at 214)  NSF responded:  "In adding another motor, will this change the model number or add an additional model to this family of products?  If so, then the PIF and Listing need to be updated . . .  If you are not changing or adding another model, and no changes are being made to the CPL or exterior design/construction of the machine, then there will be no need for updates.  (*Id.*)  In an email dated April 3, 2019, NSF states:  "Please note that we should probably add a note to the PMF or a footnote to the listing."  (App. supp. R4, tab 44 at 213)  In the emails exchanged with NSF on April 2 and 3, 2019, Hollymatic, Mr. Andres, twice sought confirmation from NSF that there were prior discussions concerning the changes to the Model 180A.  NSF did not confirm any prior discussions.  (App. supp. R4, tab 44 at 213-14)  Hollymatic did address this issue in Mr. Andres' supplemental affidavit stating, "[S]hortly after I found out that Hollymatic received the contract, I contacted Laura Hawkins, who is the person at NSF with whom I interact most often for product certification issues" (app. resp. br. at ex 1 at 3 ¶ b).  Our findings establish there is no contemporaneous evidence of Hollymatic contact with NSF prior to February 2019 regarding their new dual-motor product and, based upon Mr. Andres' testimony, at a minimum, there was no contact until after award.

*Affidavit of Ms. Susan Liskey and Declaration of Ms. Diana Gross-Bendall*

23.  Ms. Liskey testified that she was HPA's Government Account Sales Manager who prepared and submitted HPA's proposal at issue (app. resp. br. at ex 2, aff. of S. Liskey ¶¶ 5-6, 8).  Her understanding of the requirements of the solicitation was:

> Based on my experience preparing proposals for the federal government for more than 25 years, my understanding is that when a contractor submits a proposal in response to a solicitation, the contractor is telling the government that if the contractor is selected as the vendor for that contract, then when the time comes to fulfill the contract, the vendor will provide goods and equipment, matching the specifications set forth in the solicitation and proposal.

9

(*Id.* ¶ 7)

24. Ms. Liskey's also explained her actions during the source selection while responding to government questions about the revised proposal:

> [¶ 21] On November 28, 2017, I received an email follow up from DeCA contracting agent Melba Brown seeking to confirm that the revised proposal addressed three concerns that she had after her initial review of the new submission involving the separate mix and grind motors and a heater system added by the government.

> [¶ 22] That same day, I responded via email to Ms. Brown and pointed her to specific pages of the brochure and operators manual that included drawings of the second (mixer) motor and heater system that were not included in the first submission. These drawings, like the proposal itself, were made to show the government how Hollymatic proposed to build the Model 180A mixer/grinder if it was awarded the contract.

> [¶ 23] I never made any representation – intentional or otherwise-that the proposed dual-motor Model 180A had already been UL-certified or NSF approved (although I assumed that it would be, either automatically or through a new application to the UL). The documents that I submitted showing prior UL and MSF approval clearly applied to the single-motor unit (which is why they were submitted with our initial proposal, when the government was soliciting production of a single-motor mixer/grinder).

> [¶ 24] When I received a request for clarification regarding whether the Hollymatic Mixer/Grinder would have one or two motors, I responded with information regarding the two-motor system that Hollymatic would produce if it received the government contract, including an explanation that the one horse power mixer motor that was available as an option on a similar but different product would be standard on all of the two-motor units produced pursuant to the contract.

(*Id.* ¶¶ 22-24)

10

25. Ms. Gross-Bendall was the contracting officer who issued the solicitation and the Source Selection Authority (SSA) for the contract award (R4, tab 42 at 567 ¶ 3). After reviewing the affidavits of Susan Liskey, Paul Andres, and James A. Trejo, she provided testimony directly contradicting critical aspects of Ms. Liskey's testimony, stating,

> [¶ 26] Ms. Liskey's affidavit states that the final revised proposal contained drawings "to show the government how Hollymatic proposed to build the Model 180A mixer/grinder if it was awarded the contract." However, the revised proposal did not state or otherwise indicate that this was a new design of the Model 180A that it proposed to build after award. Instead, the technical material in the final proposal stated "now available."

> [¶ 27] Also, the revised proposal did not state or otherwise indicate that the UL and NSF certifications only applied to the single motor Model 180A, and/or did not apply to the Model 180A with the included optional second motor.

> [¶ 28] Nothing in the proposal, nor any other communication during discussions with Ms. Liskey, clearly identified the dual motor mixer grinder as a product that was still in the R&D phase.

> [¶ 29] The DeCA equipment contracting division does not do R&D contracts; we solicit for commercial items only.

> [¶ 30] The solicitation contained clauses applicable only to commercial items, FAR 52.212-1, 52.212-4, and 52.212-5. Thus, the solicitation called for a commercial item.

> [¶ 31] In my twenty three years of federal government contracting, I have never had a contractor offer a non-existent product for a commercial item contract.

> [¶ 32] Based on what I know now, the product offered did not meet the definition of a commercial item.

> [¶ 33] A commercial item, per paragraph 1 of the commercial item definition in FAR 2.101, is any item that has been sold, leased, or licensed to the general public; or has been offered for sale, lease, or license to the general public.

11

[¶ 35] According to the Supplemental Affidavits of Paul Andres and James A. Trejo, Hollymatic "had no plans to produce a dual-motor mixer/grinder" if they did not win the award. Based on this information, the item offered by Hollymatic did not meet the definition of a commercial item.

[¶ 36] Mr. Trejo's affidavit also stated that he would have delayed delivery until such time the UL and NSF certifications were approved. Hollymatic's proposal also did not disclose that there were any circumstances that would delay delivery of the product after award.

[¶ 37] The solicitation, and the resulting contract, required delivery of the product within 45 days of issuing an order pursuant to FAR 52.212-4(a). The Agency required mixer-grinders to be available for use immediately after award.

[¶38] Hollymatic's proposal did not disclose that we would have to wait for them to build, test, and certify the product after award.

(*Id.* at 571-72 ¶¶ 26-38)

## DECISION

The only issue before us is the government' affirmative defense of fraud in the inducement - that appellant made representations in its proposal that were either fraudulent or material misrepresentations rendering this contract *void ab initio* (gov't br. 25-26). The common law defense of fraud in the inducement may be established either by proof of fraud or material misrepresentation. RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981). It is well established that when one party to a contract induces the other party to enter into an agreement through fraud or misrepresentation, the contact is *void ab initio. J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200 (Fed. Cir 1988), *cert. denied*. 486 U.S.1057 (1988); *Supreme Foodservice GmbH*, ASBCA Nos. 57884 *et al.*, 16-1 BCA ¶ 136,387 at 177,397. However the Board does not have jurisdiction to impose civil or criminal penalties and forfeitures for a fraudulent claim. *Supreme Foodservice GmbH*, 16-1 BCA ¶ 36,387 at 177,401 n.17 (citing *United Technologies Corp.*, ASBCA No. 46880 *et al.*, 95-2 BCA ¶ 27,698 at 138,079 n.1.) The only time we may base our decision upon findings of fact grounded in fraud is when a court of competent jurisdiction has determined that a fraud occurred. *Supreme Foodservice GmbH*, 16-1 BCA ¶ 36,387 at 177,384; *Environmental Systems, Inc.*,

12

ASBCA No. 53283, 03-1 BCA ¶ 32,167 at 159,053 (*on recon.*) (citing *Martin J. Simko Construction, Inc. v. United States*, 852 F.2d 540, 547-48 (Fed. Cir. 1988)).

Here, we do not have a finding of fraud rendered by a court of competent jurisdiction. However, in such instances, we may make findings as to the material facts relating to material misrepresentation and the contract and how the acquisition regulations, statutes and contract clauses operate given those findings. *Aydin Corporation, Microwave Division*, ASBCA No. 34054, 89-1 BCA 21,206 at 106,997 ("When a contractor makes a material misrepresentation of fact that is relied on by the Government in entering into a contract, the Government has the common law right to rescind the contract (citations omitted)"); *Supreme Foodservice GmbH*, 16-1 BCA ¶ 136,387 at 177,384; *Servicios y Obras Isetan S.L.*, ASBCA No. 57584, 13 BCA ¶ 35,279 at 173,162 (citing *United States v. Acme Process Equipment Co.*, 385 U.S. 1381 (1966)); *Toombs & Co.*, ASBCA Nos. 35085, 35086, 89-3 BCA ¶ 21,993.

Three requirements must be met in addition to a misrepresentation to render a contract voidable: (1) the misrepresentation must have been fraudulent or material; (2) the misrepresentation must have induced the recipient to make the contract; and (3) the recipient must have been justified in relying on the misrepresentation. *Servicios Y Obras Isetan S. L.*, 13 BCA ¶ 35,279 at 173,162, citing RESTATEMENT (SECOND) OF CONTRACTS § 164 (1) (1981).

*Did Hollymatic Misrepresent its Product During the Source Selection?*

Misrepresentation is defined as, "an assertion that is not in accord with the facts." *L.C. Gaskins Construction Co.*, ASBCA No. 58550 *et al.*, 17-1 BCA ¶ 36,780 at 179,286, citing RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981). The government argues that the answer to this question can only be determined by considering Hollymatic's initial proposal with the final revised proposal within the context of the overall source selection (gov't br. at 27). We agree. Relevant here, the solicitation sought three requirements: that the mixer/grinder be UL listed, NSF certified, and two separate motors - one to drive the auger and a minimum 1.0 hp motor to drive the mixer (finding 4). Hollymatic's initial proposal offered the company's existing Model 180A mixer/grinder that was an existing commercial product, UL listed and NSF certified. It also included an "Approval Chart" date April 5, 2017 showing both UL and NSF had been granted years prior. Additionally, the proposal included documents and drawings from 2011 that specifically addressed the safety approval status of the products and directed the government to its drawings to confirm (finding 5). However, Hollymatic's initial proposal was found to be technically unacceptable, i.e., un-awardable, because its proposed product did not meet the minimum technical requirements (product offered only had one motor, not two as required by solicitation). Hollymatic's proposal continued to be technically unacceptable through three subsequent rounds of discussions because of the single motor issue. (Finding 6)

13

Hollymatic's final (revised) proposal submitted the Model 180A mixer/grinder (the same model number previously proposed), and included a Safety Label Placement drawing and Label List identical to the original initial proposal, and the specifications and drawings for the initially-proposed Model 180A mixer/grinder, which still included the UL label in the diagram and parts list. However, it did not include the "Approval Chart" submitted in the initial proposal. Importantly, the proposal for the first time included two motors stating, "Yes, Augers and Mixing arms are powered by separate motors. We are including our Mix Assist Motor Option at no cost. See Drawings." The final revised proposal did not identify any conditions or contingencies relating to the development of the product, UL listing or NSF certification. (Finding 8)

Probably somewhat surprised, the government requested clarification on the dual motor issue, requesting that appellant specially point out where in the CED drawings and the proposal narratives that these features were standard features and not options. Appellant, responded stating in pertinent part:

> 3.2.4. – 3D drawing is showing the mix motor. Also, Page 17 shows the grind motor. Page 18 shows the mix motor.
>
> 3.2.6. – Page 18 of the drawings. The 1 HP motor is under option because it is not used on a 175 machine. The brochure is used for both machines 175 & 180 machine. It was an option but will be standard equipment for the Government. All specifications on the CED will be standard equipment.

Additionally, the technical data for the Model 180A, submitted in the final proposal, showed a second motor under "Optional Features" for the Model 180A. (Finding 9)

The implication from appellant's final proposal was that it offered an option model of the 180A that had two motors, was UL listed, NSF certified, and more importantly, currently existed. The government evaluators had already understood that the product described in the initial proposal (Model 180A) was UL certified and NSF approved (finding 6). After reviewing the final technical proposal, the technical evaluation board rated Hollymatic's product technically acceptable resulting in appellant receiving award of the contract (finding 10).

Our findings establish that none of these representations were true. The reality is that the dual motor model did not exist during the source selection; it was a completely new product based upon a re-design of the 180A mixer/grinder requiring future development, testing and safety approval created solely to facilitate appellant's attempt to win this award (finding 17). Appellant's final proposal did not disclose the fact that the product offered in the final proposal did not yet exist because it was being developed specifically to compete for this contract and appellant was still conducting internal testing

14

of a dual model in July 2018, a month after contract award (findings 17, 25 ¶ 26). Regarding UL certification, appellant did not even start the process to obtain UL certification until ten days after award of the contract and it was not UL certified until October 31, 2018, some five months after the award (findings 18, 20). Likewise, the weight of evidence indicates appellant did not communicate with NSF regarding the dual motor model till 2019, months after the award and delivery of the mixer/grinders to the DeCA commissaries (findings 21-22).

*Appellant's Arguments*

Appellant asserts there was no misrepresentation (app. br. at 19-22; app. resp. br. at 14-33). This assertion is based primarily on two relevant arguments. First, although it is undisputed the dual-motor Model 180A did not exist and was not yet UL listed or NSF certified prior to award of the contract, the solicitation requirements (CEDs) did not specify when the CEDs must be met, but only required offeror's to promise they could meet the requirements by time of delivery (app. br. at 4-6).

Appellant, in support of its first argument, provides a sworn affidavit from Ms. Susan Liskey, HPA's Governmental Accounts Sales manager, who prepared and submitted HPA's proposal. Ms. Liskey testified that her understanding of the solicitation, based upon her 25 years of experience in preparing proposals for the federal government, was that the offer made during the source selection is only to perform at a future date, if selected and awarded the contract. (Finding 23)

We do not find Ms. Liskey's testimony or appellant's argument on this issue persuasive. None of the solicitation language indicates future compliance with the technical CEDs is sufficient to meet the CED requirements. Our plain reading of the solicitation indicates that DeCA sought to acquire a currently existing commercial product, i.e. not a developmental product, and that the product be currently UL approved and NSF certified to deserve a technically acceptable rating (findings 2-4). The whole structure of the source selection evaluation was established to confirm the offered product met the relevant CED requirements at the time of award. Additionally, Ms. Liskey's testimony was directly contradicted by the testimony of the government CO and SSA, Ms. Gross-Bendall (finding 25). Ms. Gross-Bendall testified the DeCA equipment contracting division "does not do R&D contracts; we solicit for commercial items only... and in her 23 years federal government contracting has never had a contractor offer a non-existent product for a commercial item contract" (*id.* ¶ 31).

Our reading of the solicitation is also supported by the fact this was a commercial acquisition pursuant to FAR Part 12 and the definition of a commercial item (product) in FAR 2.101, paragraph 1, requires the item to have been "sold, leased, or licensed to the general public; or has been offered for sale, lease, or license to the general public" (i.e., to presently exist in the market) (finding 2). This clearly was not the case. Mr. Andres's

15

testimony and appellant's notice of appeal admit appellant did not manufacture this product prior to the source selection and, in fact, only developed it to compete for this award, and if it did not receive the award, did not plan to produce a dual motor mixer/grinder. (Finding 17)

Second, appellant asserts no false statements or false facts were made in the final proposal or during the source selection, so there were no misrepresentations (app. resp. br. at 14-33). Ms. Liskey testified that:

> I never made any representation – intentional or otherwise-
> that the proposed dual-motor Model 180A had already been
> UL-certified or NSF approved . . . The documents that I
> submitted showing prior UL and NSF approval clearly
> applied to the single-motor unit (which is why they were
> submitted with our initial proposal, when the government was
> soliciting production of a single-motor mixer/grinder).

(Finding 24 ¶ 23) We do not find this testimony credible. It is true that Ms. Liskey never specifically stated the dual-model Model 180A had already been UL listed and NSF certified. However, by offering what appeared to be the existing Model 180A, representing the second motor as an option, created the impression the product was already UL listed and NSF as evaluated during the initial round of evaluation. As Ms. Gross-Bendall testified, the proposal, "did not state or otherwise indicate that the UL and NSF certifications only applied to the single motor Model 180A, and/or did not apply to the Model 180A with the included optional second motor." (Finding 25 ¶ 27) We conclude appellant's statements (and documentation) on the one hand and silence on the other related to the currency of UL listing and NSF certification was a "half-truth" [6] causing a misrepresentation. Additionally, appellant's statement concerning the existence of an option was false. There is no evidence that a dual-motor Model 180A option existed prior to this source selection. Appellant's one employee testified the company has never sold a dual motor mixer/grinder, development of one was only begun during this source selection to win the award, and if not awarded the contract there was no intention of selling a dual motor model (finding 17). We conclude this was clearly a misrepresentation. *L.C. Gaskins Construction Co.*, 17-1 BCA ¶ 36,780 at 179,286, citing

---

[6] *Half-truths.* A statement may be true with respect to the facts stated, but may fail to include qualifying matter necessary to prevent the implication of an assertion that is false with respect to other facts. For example, a true statement that an event has recently occurred may carry the false implication that the situation has not changed since its occurrence. Such a half-truth may be as misleading as an assertion that is wholly false. RESTATEMENT (SECOND) OF CONTRACTS § 159 cmt. b (1981).

RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981). Additionally, the statement made by Ms. Liskey regarding the government initially soliciting a single motor mixer in the initial solicitation was false (findings 4 at n.3, 24 ¶ 21).

These facts taken together establish that Hollymatic made three misrepresentations in its final revised proposal - that the dual motor 180A model offered was an existing product (a commercial product), and that it was already UL listed and NSF certified. Hollymatic did not qualify its proposal or inform the government of these facts.

*Was the Hollymatic's Misrepresentation Material?*

Comment (a) to the RESTATEMENT (SECOND) OF CONTRACTS § 162 (2) states: "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." Appellant is not new to government contracts; it has a 20 year history of selling to the government (finding 1). The dual motor requirement was new for Hollymatic and they did not have an existing dual motor grinder. After three rounds of discussions having had their proposal found to be technically unacceptable, appellant knew its only chance to win this contract was to build a dual motor version of the 180A model. So they developed one during the source selection and offered it during their final proposal. However, the evidence establishes the model offered in the final proposal was not UL listed, NSF certified and the dual motor model was still under development after award. (Findings 18-22) Hollymatic's misrepresentations were material because without them Hollymatic's offered product would have been un-awardable and it would not have been awarded the contract.

*Appellant's Argument*

Appellant points to the government's failure to verify the UL and NSF certification of the dual motor mixer/grinder offered in the final proposal as evidence that these requirements were not material. As an example, appellant relies upon the fact that the government did not ask appellant to explain why there was no UL and NSF "Approval Chart" in the final proposal as provided in the initial proposal. (App. resp. br. at 32) We reject this line of argument because we interpret this as an attempt by appellant to shift the responsibility for the accuracy of its representations to the government. The government's requirement to verify solicitation requirements is for the benefit of the government, not the contractor, and appellant may not attempt to shift responsibilities for its deficiencies not discovered by the government. *Aydin Corporation, Microwave Division*, 89-1 BCA at 106,997; *Vertex Construction*, 14-1 BCA at 175,108. As we have held in the past, "government is entitled to rely upon contractor's bid representations", *Aydin Corporation, Microwave Division*, 89-1BCA at 106,997, and "the burden is not on the government to ferret out bid misinformation", *Vertex Construction*, 14-1 BCA at 175,107.

17

Additionally, as a practical matter, the government did inquire about the sudden appearance of a dual motor version of the 180A model but was not told the offered mixer/grinder was a newly developed product. Instead, appellant represented it was offering an option to the 180A model. The implication from this representation was that the option, i.e. the dual motor version, was an existing product (the 180A), not a new one in development. Given these facts, we conclude it was reasonable for the government to rely upon its prior verification of the 180A model's UL and NSF certification during the initial evaluation.

Did Hollymatic's Misrepresentations Induce the Government to make the Contract and was the Government Justified in Relying on Hollymatic's Misrepresentation?

Regarding the issue of inducement, the government's reliance upon Hollymatic's proposal is demonstrated by the stipulated facts that: the government accepted representations of UL approval in original proposal and revised proposal, rated the final proposal technically acceptable and then awarded the contract to Hollymatic (findings 6, 10). Additionally, regarding the reliance issue, the government's reliance was justified because the government had no reason to question Hollymatic's representations in its proposal: The parties enjoyed a mutually beneficial relationship with Hollymatic supplying the government with supplies and equipment for over 20 years, with no prior issues concerning the safety of Hollymatic equipment (finding 1).

Additionally, appellant argues there was no injury to the government warranting such a severe sanction as finding the contract *void ab initio* (app. resp. br. at 42). We disagree. Based upon the evidence we conclude appellant made three misrepresentations in its final (revised) proposal. These misrepresentations were material, the government relied upon them to award appellant this contract and was justified in doing so. We further conclude that appellant would not have been found technically acceptable and consequently awarded this contract had it not misrepresented its product to the government. Accordingly, we conclude appellant's actions constituted fraud in the inducement and we find the contract void ab initio. This is a severe remedy but it is premised upon the "potential for injury to the public interest by actions which compromise the integrity of the Federal contracting process." *Servicios y Obras Isetan S.L.*, 13 BCA ¶ 35,279 at 173,162, citing *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961). We conclude that is the case here.

As the contract is deemed *void ab initio*, we need not address appellant's other arguments. Since the contract has been determined to be *void ab initio*, there is no CDA contract in being, therefore we are deprived of jurisdiction to consider appellant's affirmative appeal of the termination for cause or the appeal of the government's affirmative claim. Consequently, ASBCA Nos. 61920 and 61956 are denied. Likewise, we lack jurisdiction to order appellant to return the monies paid ($470,668) to appellant

for the 38 machines that were returned to appellant. *Supreme Foodservice GmbH*, ASBCA No. 57884 *et al.*, 20-1 BCA ¶ 37,618 at 182,636; *ABS Development Corporation*, ASBCA Nos. 60022 *et al.*, 19-1 BCA ¶ 37,234 at 181, 233; *Servicios y Obras Isetan S. L.*, 13 BCA ¶ 35,279 at 173,163.

<u>CONCLUSION</u>

The appeals are denied.

Dated: March 22, 2021

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61920, 61956, Appeals of Hollymatic Corporation, rendered in conformance with the Board's Charter.

Dated: March 23, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals